Civil Action No. ___*24MC34*___



| | |
|---|---|
| **IN RE MISSION HEALTH<br>ANTITRUST LITIGATION** | **W.D.N.C. Civil Action No.:<br>1:22-cv-00114-MR** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL NON-PARTY BLUE CROSS BLUE SHIELD OF NORTH CAROLINA TO PRODUCE DATA AND DOCUMENTS

# TABLE OF CONTENTS

**Page**

BACKGROUND ................................................................................................................. 2

I.  Background. ........................................................................................................... 2

II.  Procedural History ............................................................................................... 5

QUESTION PRESENTED .............................................................................................. 8

LEGAL STANDARD ...................................................................................................... 8

LEGAL ARGUMENT ................................................................................................... 10

I.  The Court Should Compel BCBSNC to Produce Custodial E-Mails and Documents, Which Are Relevant to the Claims and Defenses. ........................................... 10

II.  The Court Should Compel BCBSNC to Produce Custodial E-Mails and Documents Because They are Proportional to the Needs of the Case. ................................ 13

III.  BCBSNC's Expenses for Compliance Should Not Be Shifted To the Parties. ............ 14

CONCLUSION ............................................................................................................... 18

i

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*In re Aggrenox Antitrust Litig.*,
    2017 WL 4679228 (D. Conn. Oct. 18, 2017) .................................................................. 17

*In re Am. Kidney Fund, Inc.*,
    2019 WL 1894248 (D. Md. Apr. 29, 2019).......................................................... 16, 17

*Azurity Pharms., Inc. v. Biopharma Inc.*,
    2023 WL 5664278 (E.D.N.C. Sept. 1, 2023) .................................................................. 8

*Bell Inc. v. GE Lighting, LLC*,
    2014 WL 1630754 (W.D. Va. April 23, 2014)............................................................. 17

*Dmarcian, Inc. v. DMARC Advisor BV*,
    2024 WL 1722468 (W.D.N.C. April 22, 2024)...................................................... 10, 14

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    2018 WL 2445100 (D. Kan. May 31, 2018) ................................................................. 13

*In re Exxon Valdez*,
    142 F.R.D. 380 (D.D.C. 1992) ..................................................................................... 16

*Fed. Trade Comm'n v. Penn State Hershey*,
    838 F.3d 327 (3d Cir. 2016) ........................................................................................ 13

*Fed. Trade Comm'n v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020).......................................................................... 13

*FS Medical Supplies, LLC v. TannerGAP, Inc.*,
    2024 WL 1419761 (W.D.N.C. Apr. 2, 2024)......................................................... 15, 16

*Kinetic Concepts, Inc. v. ConvaTec, Inc.*,
    268 F.R.D. 226 (M.D.N.C. 2010)................................................................................ 10

*Mainstreet Collection, Inc. v. Kirkland's, Inc.*,
    270 F.R.D. 238 (E.D.N.C. 2010) ........................................................................... 10, 14

ii

*Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners*, 294 F.R.D.
    87, 100 (S.D. Ohio 2013)........................................................................... 12

*Moss v. Hardwood*,
    2019 WL 4263826 (W.D.N.C. Sept. 9, 2019) .................................................. 9

*Nallapaty v. Nallapati*,
    2021 WL 3686240 (E.D.N.C. Aug. 19, 2021)....................................... *passim*

*Oppenheimer Fund, Inc. v. Sanders*,
    437 U.S. 340 (1978)........................................................................................ 9

*Ovando v. Mountaire Farms, Inc.*,
    2024 WL 3493457 (E.D.N.C. Jul. 22, 2024)................................................. 10

*Safford v. Bojangles Restaurants*,
    2023 WL 3971698 (W.D.N.C. June 9, 2023).................................................. 15

*Socal v. Haas*,
    2021 WL 2635847 (W.D. Va. June 25, 2021)................................................. 10

*Team Schierl Cos. v. Aspirus, Inc.*,
    W.D. Wis. 22-cv-580 (Sept.27, 2024) ............................................................ 16

*U.S. ex rel. Hayes v. Charlotte Mecklenburg Hosp. Auth.*,
    2021 WL 665109 (W.D.N.C. Feb. 19, 2021) ............................................. 9, 14

*Va. Dep't of Corr. v. Jordan*,
    921 F.3d 180 (4th Cir. 2019) ...................................................... *passim*

*Valcor Eng'g Corp. v. Parker Hannifin Corp.*,
    2018 WL 3956732 (C.D. Cal. July 12, 2018)................................................. 17

**Statutes, Rules & Regulations**

Fed. R. Civ. P. 26 ......................................................................................... 8, 9

Fed. R. Civ. P. 34(c)........................................................................................... 8

Fed. R. Civ. P. 45 ............................................................................... 1, 8, 15, 16

Fed. R.Civ. P. 45(d)(1)................................................................................... 9, 15

Fed. R. Civ. P. 45(d)(2)(B)(ii)............................................................................ 15

iii

L.R. Civ. P. 7.1 ........................................................................................................................ 1

Sherman Act, 15 U.S.C. §§ 1 and 2 ......................................................................................... 3

**Other Authorities**

BCBSNC, *Corporate Fact Sheet* (July 2024),
https://s3.amazonaws.com/cms.ipressroom.com/49/files/20246/2023+C
orporate+Fact+Sheet_FINAL.pdf.................................................................................... 4

North Carolina Dep't of Insurance, *Insurance Company Market Share and
Premium Information* (2023),
https://www.ncdoi.gov/documents/financial-analysis/statistical-
data/2023p3s2group-comprehensive/open,
https://www.ncdoi.gov/documents/financial-analysis/statistical-
data/2023p3s1individual-comprehensive/open ........................................................... 4

iv

Pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, Defendants HCA Healthcare, Inc., HCA Management Services, LP, HCA, Inc., MH Master Holdings, LLLP, MH Hospital Manager, LLC, and MH Mission Hospital, LLLP (hereinafter collectively, the "HCA Defendants") and ANC Healthcare, Inc. (formerly known as Mission Health System, Inc.) and Mission Hospital, Inc. (hereinafter collectively, the "ANC Defendants" and together with the HCA Defendants, the "Defendants") move to compel Blue Cross Blue Shield of North Carolina ("BCBSNC") to comply with Defendants' non-party subpoenas dated June 17, 2024[1] by producing within 21 days documents responsive to the "high priority" requests identified during the meet and confer process, Request Nos. 6-12, 15, 18, 19, 20, 22-23 (the "High Priority Requests").

BCBSNC—a $12 billion company with more than 5,000 employees—is the largest commercial health insurer in North Carolina, with approximately 60% commercial market share. It is also the largest purchaser of commercial health care services from the Mission Health system and accounts for the vast majority of revenue the system earns from commercial insurers. As a result, BCBSNC likely stands to receive the largest share of any recovery sought by the putative class in this action.

After weeks of delay caused by misstatements to the parties' counsel regarding the data available for production, BCBSNC finally produced certain claims data and "go-get"

---

[1] Defendants simultaneously served identical subpoenas in this action and in the related action pending in the North Carolina Business Court, *Davis, et al. v. HCA Healthcare, Inc., et al.*, N.C. Super. Ct., Buncombe Cnty. Case No. 21-CVS-3476 (the "State Action"). Documents produced by BCBSNC will be used in both actions.

1

documents. But absent an agreement to shift its costs to the parties, BCBSNC has continued to refuse to collect and search custodial ESI and produce highly relevant and unique documents and e-mails that are crucial to Plaintiffs' claims and Defendants' defenses. This includes important materials regarding, among other things: (i) BCBSNC's formation of provider networks in western North Carolina that it sells as part of its health plans; (ii) prices and price trends for provider services and the premiums paid by its customers; and (iii) its strategy for contract negotiations and analyses of competition in western North Carolina. These types of documents and e-mails are commonly requested and produced in health care antitrust litigation and are particularly critical here given BCBSNC's dominance in the North Carolina insurance market.

Therefore, the Court should grant Defendants' Motion and order BCBSNC to collect custodial ESI and produce all documents responsive to Defendants' High Priority Requests within 21 days.

## BACKGROUND

**I.      Background.**

ANC Healthcare, Inc., a non-profit corporation, was formerly named Mission Health System, Inc., the parent company that directly and indirectly owned the assets that constituted the Mission Health system.[2] As of January 31, 2019, HCA acquired virtually all of Mission's assets from ANC, and HCA currently operates all Mission facilities in

---

[2] Today, the ANC Defendants exist post-sale solely to wind down discrete assets and liabilities relating to Mission that did not transfer to HCA in 2019. *See* ECF No. 43, Compl. ¶¶ 49-55.

2

North Carolina. *See In re Mission Health Antitrust Litigation*, Consolidated Class Action Compl. ¶¶ 9, 29, 35, 38-42, 74-77 (W.D.N.C., Case No. 1:22-cv-00114, ECF No. 43).

In the underlying litigation, Plaintiffs bring claims under Sections 1 and 2 of the Sherman Act, claiming that Defendants engaged in anticompetitive behavior, including monopoly maintenance, monopoly leveraging, and restraint of trade.[3] Plaintiffs' allegations center on Defendants' agreements and contractual negotiations with commercial health insurers, such as BCBSNC.

More specifically, Plaintiffs allege that Defendants have unlawfully maintained and leveraged monopoly power for inpatient general acute care ("GAC") services in the Asheville Region and restrained trade through certain contractual provisions with insurers, such as "anti-steering" and "anti-tiering" provisions and confidentiality "gag" clauses. ECF No. 43, Compl. ¶¶ 12, 120; *Davis* SAC ¶¶ 140-41. Plaintiffs also allege that Defendants leverage their monopoly power for GAC services in Asheville to monopolize inpatient care in other parts of Western North Carolina and/or outpatient care by requiring health insurers to contract for all Mission facilities or providers—so called "all-or-nothing" provisions. ECF No. 43, Compl. ¶¶ 120, 125-28; *Davis* SAC ¶ 128, 158, 181-82, 195, 224-29. These provisions, Plaintiffs allege, suppress competition and transparency and allow Mission to charge supracompetitive prices and reduce the quality

---

[3] A related action has been brought in the North Carolina Superior Court in Buncombe County under parallel North Carolina antitrust law, raising the same claims plus a claim for attempted monopolization of the Outlying Regions. *See Davis v. HCA Healthcare, Inc.*, Second Am. Compl. ("*Davis* SAC") (ECF No. 93) ¶¶ 317-57.

Case 1:24-mc-00034-UA-JEP    Document 2    Filed 12/26/24    Page 8 of 25

and volume of health care services in western North Carolina. ECF No. 43, Compl. ¶ 117, 121, 143, 149; *Davis* SAC ¶ 141, 226-30. Central to all these claims are Defendants' contracts and negotiations with BCBSNC and other commercial insurers, as well as the price and non-price effects of those contracts on competition. In addition, information shedding light on insurers' network formation strategies and contract negotiations and relationships with healthcare providers in North Carolina other than Mission is key to Plaintiffs' claims.

BCBSNC is the dominant commercial health insurer in North Carolina, with approximately 60% commercial market share and more than 5 million members across the state.[4] BCBSNC has also been a very large purchaser of services from Mission and represents the vast majority of Mission's commercial revenues. Therefore, in terms of potential recoveries, BCBSNC constitutes the largest putative class member in the federal action. ECF No. 43, Compl. ¶ 192 (defining putative class to include "all insurers and health plans that paid for GAC Services and/or Outpatient Services in the Asheville Region and/or the Outlying Region directly from one or more Defendants"). And fully-insured employers and individuals who have BCBSNC health plans will likely represent most of the putative class in the State Action. *Davis* SAC ¶ 306 (defining putative class to

---

[4] *See* BCBSNC, *Corporate Fact Sheet* (July 2024), https://s3.amazonaws.com/cms.ipressroom.com/49/files/20246/2023+Corporate+Fact+Sheet_FINAL.pdf; N.C. Dep't of Insurance, *Insurance Company Market Share and Premium Information* (2023), https://www.ncdoi.gov/documents/financial-analysis/statistical-data/2023p3s2group-comprehensive/open, https://www.ncdoi.gov/documents/financial-analysis/statistical-data/2023p3s1individual-comprehensive/open.

include "[a]ny individual or entity in the Relevant Region . . ., with regard to Defendants' acute care hospital services or ancillary products, paid some portion of the premiums, deductibles, copays or coinsurance for a self-insured or fully-insured product offered by or administered by . . . Blue Cross Blue Shield").

Further highlighting the importance of BCBSNC, both Complaints single out Mission's negotiations with BCBSNC in 2017 as an example of the alleged anticompetitive conduct. Although Defendants dispute these allegations, Plaintiffs claim that Mission tried to require BCBSNC to accept "all-or-nothing" provisions and extract a large price increase from BCBSNC. ECF No. 43, Compl. ¶ 129; *see also Davis* SAC ¶ 187. Indeed, Plaintiffs use BCBSNC as their prime example, alleging that Mission's purported "ability to bully Blue Cross into accepting its . . . anticompetitive terms . . . leaves little room for doubt" that Mission compelled other commercial insurers to "accept the same restrictive provisions." ECF No. 43, Compl. ¶ 130. Plaintiffs' focus on Mission's negotiations with BCBSNC demonstrates the crucial role BCBSNC—and its data and documents—play in the underlying actions.

## II.     Procedural History

In the underlying litigation, in addition to extensive party discovery, Plaintiffs and Defendants have served dozens of non-party subpoenas on major commercial health insurers and health care providers in North Carolina. Defendants served BCBSNC on June 17, 2024. *See* Lumsden Decl. ¶ 3, Exh. 1. Both sets of Plaintiffs served their own

5

subpoenas on BCBSNC a couple of weeks later, containing several requests similar to those in Defendants' subpoenas. *See* Decl. ¶ 6.

Defendants' subpoenas seek certain data from January 2015 to the present and certain documents from January 2016 to the present.[5] This includes: basic information about BCBSNC and its plans, such as enrollment information, premiums, and financial documents. *See* Decl. at Exh. 1, Requests 17-20, 23. It also requests information regarding BCBSNC's strategy and negotiations with Mission. *Id.*, Requests 8-9. As Plaintiffs claim that Defendants' conduct was anticompetitive and resulted in harm to competition (including the charging of supracompetitive prices), the subpoenas also seek a variety of documents and data necessary to evaluate competition and define the relevant antitrust markets, as well as to allow comparisons between Mission and other providers in the state. *Id.*, Requests 2-7, 10-16, 21-22. And finally, the subpoenas request data showing claims paid data and other data regarding premium payments, commercial products offered by BCBSNC, and plan benefit designs. *Id.*, Requests 24-30.

Over the past six months, Defendants have held ten conferences with BCBSNC to discuss the subpoena requests (often with both sets of Plaintiffs participating, as well) and exchanged numerous letters and e-mails. *See* Decl. ¶ 5. Defendants have negotiated with

---

[5] The relevant time period is reasonable and proportional because it begins only a short period of time prior to the start of the class period in the State Action (mid 2017) and the repeal of the Certificate of Public Advantage (mid 2016) that Plaintiffs claim is the source of Mission's monopoly power. In addition, Mission was owned by different sets of Defendants before and after January 31, 2019, and the parties need a sufficient time series to capture changes over time.

6

BCBSNC and endeavored to minimize BCBSNC's burden in a number of ways. For example, with respect to the parties' requests for claims data, the parties suggested that BCBSNC could largely satisfy the requests by producing claims data that it previously produced in other recent litigations. However, for several weeks, counsel for BCBSNC denied that it ever produced such data; BCBSNC only produced the data after Defendants presented to live testimony regarding the production. BCBSNC's counsel also misstated the scope of certain other data, further causing unnecessary delay. *See* Decl. ¶ 8 & Exh. 6.

To reduce the burden of subpoena compliance further, Defendants identified a subset of requests that they asked BCBSNC to prioritize, provided BCBSNC with a joint data request and a table showing the overlap between all parties' subpoena requests, and agreed to limit the scope of their requests for contracts from non-Mission providers. *See* Decl. ¶¶ 6, 7, 11 & Exhs. 4, 5, 9. On September 27, 2024, Defendants and Plaintiffs sent a joint proposed list of nine (9) custodians and twelve (12) search strings for BCBSNC to perform a custodial ESI search (which were sent again on November 26 and December 9 and discussed via videoconference on December 20. Decl. ¶ 10 & Exh. 8. Not until mid-December did counsel for BCBSNC ever object to or seek revision of the joint list of custodians or proposed search terms. *See* Decl. ¶¶ 17-18 & Exh. 15.

Yet, BCBSNC has only produced certain go-get documents[6] and certain data responsive to the subpoenas. Despite the multiple meet and confer efforts and

---

[6] The "go-get" documents consist of BCBSNC's "contract file" for Mission Health, which includes external e-mails exchanged between BCBSNC and Mission from early 2019 through 2024 and contracts between BCBSNC and Mission; contracts between

7

compromises by the parties' counsel, BCBSNC still refuses to collect and produce custodial e-mail and documents, arguing that "the parties' request for additional e-mails is not reasonable in the circumstances" and that "the cost for such searches should be borne exclusively by the parties, not BCBSNC." *See* Decl. ¶¶ 9, 12, 15 & Exhs. 7, 10, 13. BCBSNC's counsel estimated that it will cost $80,000-$100,000 to complete an ESI collection and production. Decl. ¶ 15 & Exh. 13. But BCBSNC has not yet even collected the custodial data, run the search terms proposed on September 27, or otherwise substantiated its demand to shift the entirety of its expenses to the parties—despite the parties' repeated oral and written requests for such information. *See, e.g.*, Decl. ¶¶ 13-14 & Exhs. 11-12.

## QUESTION PRESENTED

Whether non-party Blue Cross Blue Shield of North Carolina should be compelled to collect and produce custodial ESI and documents in response to Defendants' High Priority Requests, pursuant to subpoenas issued by the United States District Court for the Western District of North Carolina and the North Carolina Superior Court in Buncombe County.

## LEGAL STANDARD

According to Rule 34 of the Federal Rules of Civil Procedure, "a nonparty may be compelled to produce documents and tangible things." Fed. R. Civ. P. 34©. Rule 45

---

BCBSNC and a select group of non-Mission providers in the region; BCBS's template contracts; and benefit plan design information.

"adopts the standard codified in Rule 26 in determining what is discoverable." *Azurity Pharms., Inc. v. Biopharma Inc.*, 2023 WL 5664278, at *2 (E.D.N.C. Sept. 1, 2023). Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *Moss v. Hardwood*, 2019 WL 4263826, at *13 (W.D.N.C. Sept. 9, 2019).

"[R]elevance is broadly construed 'to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Nallapaty v. Nallapati*, 2021 WL 3686240, at *4 (E.D.N.C. Aug. 19, 2021) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). "Relevance is not, on its own, a high bar." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019); *see also U.S. ex rel. Hayes v. Charlotte Mecklenburg Hosp. Auth.*, 3:16-CV-00750-GCM, 2021 WL 665109, at *2 (W.D.N.C. Feb. 19, 2021).

To determine proportionality, "[t]he ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient." *Hayes*, 2021 WL 665109, at *2 (citing *Va. Dep't of Corr.*, 921 F.3d at 189). The party serving a subpoena "must take reasonable steps to avoid imposing undue burden or expense" on the subpoenaed party. F.R.C.P. 45(d)(1)()(3)(iv). Whether to grant a motion to compel "is generally left within the district court's broad discretion." *Moss*, 2019 WL 4263826, at *13 (citing *Va. Dep't of Corr.*, 921 F.3d at 188).

9

But the "party or person resisting discovery, not the party moving to compel discovery, bears the burden of persuasion." *Dmarcian, Inc. v. DMARC Advisor BV*, 2024 WL 1722468, at \*1 (W.D.N.C. April 22, 2024) (quoting *Kinetic Concepts, Inc. v. ConvaTec, Inc.*, 268 F.R.D. 226, 243 (M.D.N.C. 2010)). This means the subpoenaed party must explain "with particularity" how burdensome production would be and "why discovery should be denied." *Nallapaty*, 2021 WL 3686240, at \*4. There is a "more demanding" proportionality analysis when the subpoena is served on a nonparty," *id.* at \*2 (quoting *Va. Dep't of Corr.*, at 189), because "bystanders should not be drawn into the parties' dispute without some good reason," but "conclusory or generalized statements" of burden are not enough. *Id.* at \*4 (quoting *Mainstreet Collection, Inc. v. Kirkland's, Inc.*, 270 F.R.D. 238, 240 (E.D.N.C. 2010). And where, as here, a nonparty is not a "bystander" to the litigation with "no dog in the fight," their nonparty status does not receive the same "special weight" received by bystanders. *See Ovando v. Mountaire Farms, Inc.*, 2024 WL 3493457, at \*2 (E.D.N.C. Jul. 22, 2024) (some nonparties are not "bystanders"); *Socal v. Haas*, 2021 WL 2635847, at \*3 (W.D. Va. June 25, 2021).

## LEGAL ARGUMENT

**I.    The Court Should Compel BCBSNC to Produce Custodial E-Mails and Documents, Which Are Relevant to the Claims and Defenses.**

The documents and information requested in the High Priority Requests are directly relevant to Plaintiffs' claims and Defendants' defenses. "[R]elevance is broadly construed to encompass any matter that bears on, or that reasonably could lead to other

10

matter that could bear on, any issue that is or may be in the case." *Nallapaty*, 2021 WL 3686240, at *4 (citations and quotations omitted).

Defendants' High Priority Requests seek documents regarding BCBSNC's formation of networks and its contractual negotiations with Mission and other providers in western North Carolina. *See, e.g.*, Decl. Exh. 1, Request Nos. 7-9, 11, 15. These documents are relevant to the Complaints, which focus on contractual negotiations between health insurers and Mission and the alleged effects of those contracts. Defendants also seek information regarding the purported effects of the alleged contractual provisions on prices paid by commercial insurers like BCBSNC and/or the premiums paid by BCBSNC members and fully-insured employers; the insurers' ability to steer patients to their desired providers or build tiered networks; and the alleged foreclosure of competitors. *See, e.g.*, Decl. Exh. 1, Request Nos. 6, 7, 10, 12-14, 19, 22.

There is no dispute that BCBSNC possesses unique documents relevant to each of these topics, which cannot be obtained from Defendants or any other source. *See Va. Dep't of Corr.*, 921 F.3d at 189 (noting that Court "should also consider what information is available to the requesting party from other sources"). While Defendants possess e-mails exchanged between Mission and BCBSNC (the only e-mails BCBSNC has produced), they do not possess BCBSNC's internal e-mails and strategic analyses, nor do they possess BCBSNC's communications with competing providers in the area. As a result, there can be no question that the requested documents "bear on" issues in the actions. *Nallapaty*, 2021 WL 3686240, at *4.

11

Moreover, as above, the Complaints single out Mission's negotiations with BCBSNC as the prime example of Mission allegedly "bully[ing]" insurers "into accepting its . . . anticompetitive terms." ECF No. 43, Compl. at ¶ 130. In fact, Plaintiffs use BCBSNC as a basis for their allegations concerning Mission's negotiations *with other insurers*, stating that Mission's negotiations with BCBSNC "leave[ ] little room for doubt" that Defendants compelled other commercial insurers to accept restrictive provisions in their negotiations. *Id.* While Defendants vigorously dispute these allegations regarding its negotiations with BCBSNC, Plaintiffs' focus on BCBSNC in the Complaint clearly demonstrates the relevance and great importance of its documents in litigating these cases.

Furthermore, the types of documents requested are commonly produced by commercial insurers (including other Blue Cross Blue Shield plans) in health care antitrust cases. *See, e.g., Med. Ctr. at Elizabeth Place, LLC v. Premier Health Partners,* 294 F.R.D. 87, 100 (S.D. Ohio 2013) (compelling non-party Anthem Blue Cross to produce party contracts, communications with parties, specific policies, internal communications, and more); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,* 2018 WL 2445100, at *3 (D. Kan. May 31, 2018).

The documents BCBSNC possesses are also relevant to defining the appropriate antitrust markets. *See, e.g.,* Decl. Exh. 1, Request Nos. 6, 7, 8, 15, 19, 22. In the healthcare context, market definition is informed by the two-stage model of healthcare competition: "in the first stage, hospitals compete to be included in an insurance plan's

12

hospital network. In the second stage, hospitals compete to attract individual members of an insurer's plan." *Fed. Trade Comm'n v. Penn State Hershey*, 838 F.3d 327, 342 (3d Cir. 2016). When defining the relevant geographic and product markets within which to analyze that competition, "our analysis must focus, at least in part, on the payors who will feel the impact of any price increase," because patients utilize insurance to cover the majority of their costs. *Id.* (because insurers "are the ones who negotiate directly with the hospitals," market definition must be analyzed "through the lens of the insurers"); *see also Fed. Trade Comm'n v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 542-44 (E.D. Pa. 2020) (analyzing market definition from payors' perspective because they "negotiate directly with the hospitals"). Because BCBSNC is the dominant payor in North Carolina, and the largest customer of Mission, its perspective is vital in determining the relevant antitrust markets at issue in both actions.

## II. The Court Should Compel BCBSNC to Produce Custodial E-Mails and Documents Because They are Proportional to the Needs of the Case.

Not only are the requested documents relevant, but they are also proportional to the needs of the case—the parties' need for the data outweighs any burden on BCBSNC in producing it. *See Va. Dep't of Corr.*, 921 F.3d at 189; *Hayes*, 2021 WL 665109, at *2 ("The ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient."). In a proportionality analysis, the requested information need only be "likely" to have "marginal benefit in litigating important issues." *Va. Dep't of Corr.*, 921 F.3d at 189. As explained above, the requested documents

13

are key to defending against liability, determining the putative classes, and establishing affirmative defenses.

Although BCBSNC contends that a custodial ESI collection and production is "not reasonable in the circumstances," it bears the burden of persuasion. S*ee Dmarcian, Inc.,* 2024 WL 1722468, at \*1. To refuse production of the requested documents, BCBSNC must explain "with particularity" how burdensome production would be and "why discovery should be denied." *Nallapaty*, 2021 WL 3686240, at \*4. To date, BCBSNC has not done so despite numerous requests from the parties. *See, e.g.*, Decl. ¶ 13. And while BCBSNC has estimated that it will cost $80,000 - $100,000 to conduct a custodial ESI collection, it has not substantiated this estimate or otherwise provided "the dollar-and-cents" costs associated with the requests. *Va. Dep't of Corr.*, 921 F.3d at 189-90. Instead, it has provided only "conclusory or generalized statements" of burden, which is not enough. *Nallapaty*, 2021 WL 3686240, at \*2 (quoting *Mainstreet Collection, Inc.*, 270 F.R.D. at 240).

Thus, the Court should compel BCBSNC to produce documents responsive to the High Priority Requests they identified during the meet and confer process (Request Nos. 6-12, 15, 18, 19, 20, 22, 23) because they go to the heart of the issues in the case, and, as BCBSNC has admitted, it is a key witness in the actions.

## III. BCBSNC's Expenses for Compliance Should Not Be Shifted To the Parties.

During the meet and confer process, BCBSNC asserted that the parties should pay all or a very significant portion of BCBSNC's costs to conduct a custodial ESI collection

14

and production to comply with the subpoenas. *See* Decl. ¶¶ 15, 18. Although BCBSNC

has not provided any supporting detail or even collected the data necessary for a custodial

ESI production (for custodians identified almost three months ago), it estimates it will

cost $80,000-$100,000 to do so. *Id.*

There is no basis to require the parties to compensate BCBSNC. Rule 45 of the

Federal Rules of Civil Procedure provides that "[a] party or attorney responsible for

issuing and serving a subpoena must take reasonable steps to avoid imposing undue

burden or expense on a person subject to the subpoena." F.R.C.P. 45(d)(1). If a

subpoenaed party objects to a subpoena and the Court then compels the recipient to

respond, the Court "must protect a person who is neither a party nor a party's officer from

*significant expense* resulting from compliance." F.R.C.P. 45(d)(2)(B)(ii) (emphasis

added). The Court considers several factors, including: "(1) whether the non-party

actually has an interest in the outcome of the case; (2) whether the non-party can more

readily bear its costs than the requesting party; and (3) whether the litigation is of public

importance." *FS Medical Supplies, LLC v. TannerGAP, Inc.*, 2024 WL 1419761

(W.D.N.C. Apr. 2, 2024); *see also Safford v. Bojangles Restaurants*, 2023 WL 3971698,

at *2 (W.D.N.C. June 9, 2023) (citing *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C.

1992)).[7]

---

[7] Courts also find a determination of cost-sharing to be premature when the non-party has
not yet responded to the subpoena, as "the costs of their compliance are not yet known."
*FS Medical Supplies, LLC*, 2024 WL 1419761, at *4.

15

To shift costs and fees, BCBSNC must demonstrate that Defendants failed to "take reasonable steps to avoid imposing undue burden or expense." Fed. R. Civ. P. 45(d)(1). BCBSNC cannot do so. As described above, Defendants have actively worked with Plaintiffs and BCBSNC over six months to narrow the scope and burden of the subpoena, negotiate search terms and document custodians, and isolate responsive information. Indeed, in a similar hospital monopolization case in the Western District of Wisconsin, the district court recently rejected non-party insurers' requests for cost-shifting where the third parties failed to substantiate the request and the parties actively engaged in negotiations to narrow the scope of the subpoenas. Op. & Order (ECF No. 115), *Team Schierl Cos. v. Aspirus, Inc.*, W.D. Wis. 22-cv-580 (Sept. 27, 2024); *see also In re Am. Kidney Fund, Inc.*, 2019 WL 1894248, at *6 (D. Md. Apr. 29, 2019) ("Where a serving party engages in good faith negotiations to resolve a conflict over its subpoena and to avoid imposing an undue burden, courts have declined to impose Rule 45 sanctions absent a showing that the subpoena was issued in bad faith, for an improper purpose, or in a manner inconsistent with existing law.").

BCBSNC has also not met its burden of demonstrating that its costs are "significant"; indeed, BCBSNC has provided *no evidence whatsoever* to substantiate its estimate and has taken no steps to do so. BCBSNC also takes the position that the parties must bear 100% of its costs—with BCBSNC bearing nothing—or, at a minimum, a significant portion of BCBSNC's expenses. But to the extent cost shifting is required,

16

courts shift only the portion of the expenses "above the level of 'significance' to the party serving the subpoena." *In re Am. Kidney Fund, Inc.*, 2019 WL 1894248, at *4.

Moreover, BCBSNC is not an innocent "bystander" with no interest in the outcome of the litigations. Instead, it is a large part of the putative class and has significant skin in the game. *See id.* at *8 ("When the non-party producing materials has a potential interest in the underlying litigation, courts have weighed that interest against shifting costs.") (citing *Bell Inc. v. GE Lighting, LLC*, 2014 WL 1630754 (W.D. Va. April 23, 2014)).

Finally, the parties should not be obligated to compensate BCBSNC for its continual delays and tactical decisions not to produce highly relevant and responsive documents to comply with the subpoenas. Courts routinely refuse to reimburse non-parties when they unnecessarily resist compliance with a subpoena. *See, e.g., In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *1, 10 (D. Conn. Oct. 18, 2017) (noting that protection from discovery expenses "does not mean that the requesting party must bear the entire cost of compliance" and that requesting party "should not be required to bear the cost of [the non-party's] unilateral decision to litigate issues related to the subpoena zealously") (internal quotation marks omitted); *Valcor Eng'g Corp. v. Parker Hannifin Corp.*, 2018 WL 3956732, at *3 (C.D. Cal. July 12, 2018) (noting that much of nonparty's expenses were "incurred due to [the non-party's] tactical decision[s]").

17

# CONCLUSION

For the foregoing reasons, the Court should compel Blue Cross Blue Shield of North Carolina to produce the data and documents responsive to Defendants' High Priority Requests.

Dated: December 23, 2024

Respectfully submitted,

<table>
<tr><td>

*/s/ Phillip T. Jackson*
Phillip T. Jackson (N.C. Bar No. 21134)
John Noor (N.C. Bar No. 43102)
David Hawisher (N.C. Bar No. 55502)
ROBERTS & STEVENS, PA
P.O. Box 7647
Asheville, NC 28802
Phone: (828) 252-6600
pjackson@roberts-stevens.com
jnoor@roberts-stevens.com
dhawisher@roberts-stevens.com

*Counsel for the HCA Defendants*

</td><td>

*/s/ Dana C. Lumsden*
Dana C. Lumsden (N.C. Bar No. 32497)
Hanna E. Eickmeier (N.C. Bar No. 54927)
BRADLEY ARANT BOULT CUMMINGS LLP
214 North Tryon Street, Suite 3700
Charlotte, NC 28202
Telephone: 704-338-6034
Facsimile: 704-332-8858
dlumsden@bradley.com
heickmeier@bradley.com

Jonathan H. Todt (N.C. Bar No. 52952)
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, D.C. 20005
Telephone: 202-842-8800
Facsimile: 202-842-8465
jonathan.todt@faegredrinker.com

*Counsel for the ANC Defendants*

</td></tr>
</table>

18

## <u>LR 7.3(d) CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies that the foregoing ***Memorandum in Support of Defendants' Motion to Compel Non-Party Blue Cross Blue Shield of North Carolina to Produce Data and Documents*** complies with the word count requirement of Local Rule 7.3(d)(1), such that the brief does not exceed 6,250 words, including the body of the brief, headings, and footnotes but not including the caption, signature lines, certificates of service, cover page, or indices.

BRADLEY ARANT BOULT CUMMINGS LLP

By:   */s/ Dana C. Lumsden*
      Dana C. Lumsden

19

## <u>ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her discretion (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Dana C. Lumsden*
Dana C. Lumsden